GEORGE M. KAGAN, PLAINTIFF-RESPONDENT, v. LILLIE BERMAN, DEFENDANT, AND MORRIS BERMAN, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 22, 1953—Decided July 21, 1953.

Before Judges STEIN, PROCTOR and CONLON.

*Mr. Maurice C. Brigadier* argued the cause for defendant-appellant (*Messrs. Margulies & Kaplowitz,* attorneys).

*Mr. Ira D. Dorian* argued the cause for plaintiff-respondent (*Mr. Chester Weidenburner,* attorney).

The opinion of the court was delivered by

PROCTOR, J. S. C. (temporarily assigned). Plaintiff brought an action against Morris Berman and Lillie Berman to recover compensation for legal services. The action against Lillie Berman was dismissed at the end of plaintiff's case. The trial resulted in a verdict in favor of the plaintiff for $4,000 and the defendant Morris Berman appeals from the judgment entered thereon.

The first point urged for reversal is that the trial court erred in denying defendant's motions for dismissal at the end of plaintiff's case and for judgment at the end of the whole case, the contention being that in rendering services for the defendant, the plaintiff acted as a real estate broker and his action, not being based on a writing, was barred by the statute of frauds (*R. S.* 25:1–9). We consider

only the ruling denying the motion for judgment. *City National Bank and Trust Co. v. Hassler,* 9 *N. J. Super.* 153 (*App. Div.* 1950).

In the pretrial order it was stipulated:

"The issues to be determined at the trial are: (a) whether or not def. requested plaintiff to perform any legal services (b) if said services were requested, what they consisted of and the reasonable value."

At the trial the evidence tended to show the following situation: The plaintiff is an attorney-at-law. In March 1951 the defendant telephoned the plaintiff regarding property owned by the defendant and his wife. The defendant said "he was anxious to dispose of his property on Main Street," Rahway; that certain persons had made inquiries regarding its purchase but nothing had materialized and he asked the plaintiff "whether it was possible for me (plaintiff) to do anything about securing a large commercial building situation on Main Street that would enable him (defendant) to dispose of his property." The defendant asked the plaintiff to see him for further discussion. At a meeting of the parties shortly thereafter, the plaintiff called attention to the poor condition of the building on the property; he also told the defendant that the frontage of the property was too small to attract any large commercial development. The defendant's property had a frontage of approximately 53 feet and consisted, in part, of a house and two attached stores. One store was vacant and the defendant operated his business in the other. Adjacent to the defendant's property was a plot owned by people named Fox, which plot had a frontage of approximately 40 feet, and beyond that was a property with a frontage of about 78 feet owned by the Robert Allen Realty Corporation. The plaintiff was the majority stockholder of this corporation. During the discussion the defendant suggested the possibility of joining his property with the other two. Both knew that the intervening plot had been recently acquired by the Foxes for the purpose of building a store thereon, since they would

soon be compelled to vacate the premises in which they were conducting their business. The plaintiff testified:

"So he (defendant) asked me whether it wouldn't be possible for me, in behalf of him and his wife, to contact the Foxes to see whether something couldn't be worked out to tie in the pieces together, and also to see what I could do as far as attracting the proper type of commercial development.

So before making any decision on that, I asked him what he thought he would want to dispose of his property for, and he asked me for an expression of opinion from myself, and I gave it to him. I told him that I thought the land was worth $500 a front foot, and having 53½ feet, his property was worth between $26,000 and $27,000. And he told me that if he could get that kind of a price he would be very happy to dispose of it.

So I went into the question of what would be involved in so far as accomplishing this whole thing, and I told him there was a considerable amount of work involved, and I wouldn't want to step into this situation unless there was some arrangement for compensation. His attitude was: George, I certainly didn't ask you to step into this picture and do this for nothing for me. You bring this transaction about whereby you can bring this whole deal to a conclusion, and bring in a commercial development, and I will be glad to pay you what the thing is worth, or whatever reasonable figure that you think the thing is worth. That was late in March, 1951."

Following the above conversation the plaintiff communicated with the Foxes and their attorney on a number of occasions, but they steadfastly refused to sell. The plaintiff then proposed having the Foxes sell their property to the defendant and that the defendant give back in part payment a 20-foot frontage of his property on the far end. This proposal would give the Foxes a site for their contemplated store building and would enlarge the defendant's frontage to about 73 feet. This frontage, together with that of the Robert Allen Realty Corporation totalled approximately 151 feet. The assembled properties would be more attractive to a large mercantile development. The Foxes tentatively agreed to this arrangement.

Shortly thereafter the plaintiff had an engineer prepare a sketch of the three properties and the immediate surrounding area of Main Street. It was prepared so as to show the desirability of the assembled properties for a large mercantile

development, and indicated the traffic flow and the parking facilities. Five hundred copies of this sketch were sent to the leading "real estate chains and commercial brokers." In June 1951 plaintiff was advised by Alexander F. Roe, a real estate broker, that the latter had a potential buyer who was interested in acquiring the assembled properties at $500 a front foot. Plaintiff advised the defendant of Roe's prospective buyer. The defendant was pleased with the offer but expressed concern about plaintiff's ability to obtain the Fox property. He then requested the plaintiff to ascertain if the Foxes were still willing to proceed with the arrangement. The plaintiff again communicated with the Foxes and their attorney and, after several conversations with them, they reaffirmed their willingness to dispose of their 40-foot frontage on condition that they obtain a 20-foot frontage of defendant's property.

On July 16, 1951 the Robert Allen Realty Corporation gave Roe an authorization to sell its property at $500 a front foot, and two days later the Foxes gave Roe an authorization to sell their property at the same price. The plaintiff then prepared a similar authorization to cover the defendant's property but the defendant refused to sign it. He advanced three reasons for his refusal: first, the sale would disrupt his business; second, that after he had discussed the matter with the plaintiff he had leased by oral agreement the vacant store on his property for a two-year term to one Treadwell and he did not know whether he could deliver possession; and third, he now felt his property was worth much more than the price offered. Upon being advised of this by the plaintiff, Roe induced his client to increase the offer to $35,000, which sum the defendant likewise refused. In the middle of September 1951 defendant asked the plaintiff to inform Roe that he would accept $1,000 a front foot for his property, or $50,000 net. The plaintiff so informed Roe and on September 17, 1951 defendant signed an authorization to sell at that price within 30 days, the commission to Roe to "be paid from that amount of money in excess of the amount above stated." Later, upon agreement of the par-

ties, the authorization was extended to October 29, 1951. This extension was prepared by the plaintiff.

It was understood that the prospective buyer would not accept the defendant's property with the Treadwell lease outstanding. The plaintiff and the defendant had a number of discussions about the removal of this obstacle to the sale. The plaintiff first suggested that the defendant offer Treadwell a nominal sum to vacate. This offer was refused by Treadwell, but the plaintiff finally persuaded him to enter into a written lease with the defendant on a month-to-month basis at a reduced rental. This lease was prepared by the plaintiff and executed by Treadwell and the defendant.

Shortly before the contracts of sale were to be executed the plaintiff suggested that it would save the defendant search fees if all the parties would agree to convey their properties to the buyer at the same time and he in turn would agree to convey to the Foxes 20 feet frontage of the property deeded to him by the defendant. This was the procedure followed when the contracts were signed.

The titles were closed on December 27, 1951, the defendant receiving the sum of $52,500 for his property, of which sum he gave Roe $2,500 for his commission. Roe also received commissions from the Foxes and the Robert Allen Realty Corporation. Immediately after the closing of titles, plaintiff sent the defendants a bill for $5,000 for "legal services."

At the trial plaintiff called as an expert witness Clarence J. Ward, an attorney, who testified that in his opinion $5,000 was fair and reasonable for the legal services performed by the plaintiff.

■■ It appears from the above that there was testimony from which the jury could find that the defendant solicited the services of the plaintiff in the latter's character of an attorney. The practise of law does not lend itself to a precise and all-inclusive definition. *Carey v. Thieme*, 2 *N. J. Super.* 458 (*Ch. Div.* 1949). In *Tumulty v. Rosenblum*, 134 *N. J. L.* 514, at *Page* 518 (*Sup. Ct.* 1946), Justice Heher said:

"The character of the service rendered is the controlling consideration. Legal service that avoids the pitfalls leading to litigation is not of less value, economic and otherwise, than that contributed to the judicial solution of controversies arising out of unintelligent legal advice or no counsel at all. Indeed, it is usually of far greater advantage. The licensing of attorneys and counsellors is grounded in the public right to protection against unlearned and unskillful advice in matters relating to the science of the law."

■ The Legislature has recognized that attorneys may also perform the functions of real estate brokers. See *R. S.* 45:15–4. In the present case there was evidence that the plaintiff, at the request of the defendant, assembled the three plots and thereby made the defendant's property available for a mercantile development. This entailed the obtaining of an agreement by the Foxes to dispose of their property as a necessary part of the arrangement. It also required the negotiation, preparation and execution of the Treadwell lease. It may be noted that the plaintiff's services in connection with the Treadwell lease saved the defendant from possible litigation by Roe for a commission. The authorization for the performance of these services was not required to be in writing by the statute of frauds. *Brown v. Winter*, 80 *N. J. L.* 632 (*Sup. Ct.* 1910), affirmed 82 *N. J. L.* 729 (*E. & A.* 1912); *Klie v. Hollstein*, 98 *N. J. L.* 473 (*E. & A.* 1922); *J. I. Kislak, Inc. v. Judge*, 102 *N. J. L.* 506 (*Sup. Ct.* 1926).

■ It is conceded that the plaintiff performed some legal services, *e. g.*, the preparation of the Treadwell lease. A judgment of dismissal cannot be granted where the plaintiff may be entitled to compensation for any of the services performed. *Ziegener v. Daeche*, 91 *N. J. L.* 634 (*E. & A.* 1918); *Westervelt v. Kunz*, 105 *N. J. L.* 367 (*E. & A.* 1929).

The defendant relies on the case of *Stout v. Humphrey*, 69 *N. J. L.* 436 (*E. & A.* 1903). That case may be distinguished in that there the oral agreement merely engaged the plaintiff, who was an attorney, to obtain a purchaser for the property, whereas, in the present case, the services to be performed by the plaintiff were of an entirely different

nature, *i. e.*, he was called upon and did perform services in assembling a tract of land which included the defendant's property, and performed other services which resulted in enhancing the saleability of the defendant's property. It has been said in construing the statute which provides for the licensing of real estate brokers (*R. S.* 45:15–1), that

"Agreements requiring services beyond the mere listing for and negotiating of sale of the real estate of another may be actionable when the facts support an inference the one rendering these services is not a mere broker but a promotor." *Solomon v. Goldberg*, 11 *N. J. Super.* 69 (*App. Div.* 1950) ;

see also *O'Neill v. Colonial Memorial Park, Inc.*, 121 *N. J. L.* 617 (*Sup. Ct.* 1939) ; *Griffith v. Daly*, 56 *N. J. L.* 466 (*Sup. Ct.* 1894).

Defendant also argues that there was no competent evidence of the value of plaintiff's services. He contends that plaintiff's witness, Ward, was not qualified as an expert. Competency of one to give opinion evidence as an expert is primarily in the discretion of the trial court and the admission or exclusion of such testimony on the ground that the witness was or was not qualified to testify as to his opinion as an expert, will not be reversed except where there is no evidence to support the witness' qualifications, or where the trial court has proceeded upon erroneous legal standards. *Grand View Gardens, Inc. v. Hasbrouck Heights*, 14 *N. J. Super.* 167 (*App. Div.* 1951). Ward was a practising attorney for 30 years; he was for 25 years attorney for a building and loan association and had participated in over 2,000 real estate closings. The trial court properly exercised its discretion in permitting the witness to testify. Defendant also contends that Ward's opinion was predicated in part on services other than legal services performed by the plaintiff. Ward was asked on direct examination his opinion of the fair and reasonable charge of the services which were detailed in the plaintiff's testimony. After a colloquy with counsel the trial court limited the services upon which Ward's opinion was to be based to those which

plaintiff performed as a "legal representative" as distinguished from a real estate broker. No objection was made by the defendant, and Ward testified that a fair and reasonable fee for the legal services performed by the plaintiff was $5,000. We are satisfied that the testimony given by Ward was competent.

The action of the trial court in submitting the case to the jury was proper.

Defendant finally argues that the trial court erred in respect to one of defendant's requests to charge. His contention is not grounded on the refusal to charge the request but is based on the manner in which the request was given. We find no merit in this contention and, in any event, no objection having been taken, the action of the trial court cannot now be considered. *Rule* 3 :51.

Judgment affirmed.